NOT DESIGNATED FOR PUBLICATION

No. 117,952

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHARLES D. BOWSER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed September 21, 2018. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jennifer S. Tatum*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., BRUNS and GARDNER, JJ.

PER CURIAM: Charles D. Bowser appeals following his convictions for aggravated robbery, aggravated burglary, and criminal possession of a firearm. Bowser argues: (1) There was insufficient evidence to support his aggravated burglary conviction, (2) the district court erred in instructing the jury in several respects, (3) the prosecutor committed error during closing argument, and (4) the cumulative effect of the alleged errors deprived him of a fair trial. For the reasons stated below, we affirm.

1

On the evening of January 18, 2015, Wyandotte County Police Detective Ryan Fincher was dispatched to an apartment in Kansas City, Kansas, following a report of an armed robbery. Upon arrival, Fincher made contact with the victims, Samuel Sims and his fiancée, Amy Brady. Fincher spoke with Sims, who advised that he and Brady were in their bedroom when he heard a knock at the door. Sims stated that when he looked out the peep hole, he saw an individual who he knew as "Ten or Lil Ten." Sims explained that Ten was a cousin of an acquaintance named Mikey and that he had been around Ten on three prior occasions. Sims stated that when he opened the door, Ten entered the apartment, pointed a handgun at him, and demanded money. Sims described Ten as a slim black male with a dark complexion, 6 feet tall, 150 pounds, and dressed in all black. Sims also stated that a second individual entered the apartment with Ten. Sims described this person as a black male with a dark complexion, about 6' 2", 230 pounds, about 30 years old, and dressed in all black. Sims told Brady to retrieve the money from under their mattress and bring it out to the men. Sims stated that the second man took the gun from Ten and used it to hit Sims in the head. Sims said that Brady, who was naked, ran out of the apartment and the two robbers followed her. Sims then heard a gunshot and called 911 to report that his girlfriend might have been shot.

Detective Fincher also spoke with Brady, who was emotional and upset. Brady stated that she was in the bedroom when she heard Sims respond to the knock at the door. Brady heard male voices and heard Sims request the money from under the mattress. Brady said that she recognized the men from the neighborhood. She described the first suspect—who Sims identified as Ten—as a tall black male in his late teens or early 20s, dressed in all black and wearing a hoodie and beanie. Brady described the second suspect as a shorter black male in his 30s or 40s, dressed in all black and wearing a hoodie and beanie. Brady stated that the second suspect's hood was up and she could not see his face very well. Brady reported that in addition to the money from under the mattress, the men

also took a shotgun and Sims' wallet. Brady said that after running out of the apartment, she heard a gunshot and hid alongside the apartment building.

Sims later learned that Ten's real name was Charles Bowser and reported this information to Detective Fincher. Fincher obtained a photograph of Bowser and placed it in a photographic lineup with five other individuals. Sims and Brady each separately identified Bowser as the first suspect, who Sims had identified as Ten. Sometime thereafter, Sims contacted Fincher to report that he had seen a picture of the second suspect online and learned that his name was Dyron King. Sims subsequently identified King as the second suspect in a photographic lineup. When presented with this same photographic lineup, Brady did not identify King as the second suspect.

The State charged Bowser with one count each of aggravated robbery, aggravated burglary, and criminal possession of a firearm. The State charged King with one count each of aggravated robbery, aggravated burglary, aggravated battery, and criminal possession of a firearm.

The cases were consolidated for trial, where the State presented evidence from law enforcement, Sims, and Brady. Sims identified Bowser as the man he knew as Ten. Sims explained that his acquaintance, Mikey, was Ten's cousin. Sims said that he had smoked marijuana with Ten on a couple of occasions before January 18, 2015. Sims testified that he recognized Ten right away when he looked through the peep hole and that when he opened the door, Ten came inside, pulled out a gun, and demanded money. Sims said he thought it was a joke at first but realized it was not after Ten threatened to shoot him and when the second suspect, who Sims did not know, came inside. Sims then told Brady to bring the money from under the mattress in the bedroom and give it to the men. Sims said that in addition to the money from the mattress, Brady also gave the men her purse and Sims' wallet. At some point, Ten handed the gun to the second suspect, who ultimately hit Sims in the head with it. Sims identified King as the second suspect. Sims noted that

3

while King was pointing the gun at him, Ten went through the kitchen cabinets searching for more money. Sims admitted that he had smoked marijuana earlier that night but claimed it did not affect his ability to provide information to Detective Fincher or his memory of the evening's events.

Brady testified that both robbers wore dark baggy clothing and that she could tell one of the men was black but did not recognize him at that time. Brady stated that she got a good look at the first suspect's face when she handed him her purse and Sims' wallet. Brady described the first suspect as in his teens or early 20s with a dark skin tone and bright, white, beady eyes. Brady testified that he later came into her bedroom and took a shotgun from her. Brady identified this man as Bowser. Brady stated that she had difficulty recalling for the police what had happened that night because she was scared and confused. Brady admitted to smoking marijuana a couple of hours before the robbery but claimed that it did not affect her ability to see or recall certain details about Bowser's face. Brady testified that she did not recognize King.

The only witness Bowser called to testify was his mother, Tracy Rowland. She testified that Bowser was not in Kansas on January 18, 2015, because he was in Texas from January 15 to January 22. Rowland admitted that she did not give this information to the police after Bowser's arrest for crimes occurring on January 18, 2015.

The jury found Bowser guilty as charged and found King not guilty of all charges. The district court sentenced Bowser to a controlling prison sentence of 120 months with a postrelease supervision term of 36 months. Bowser timely appeals.

ANALYSIS

Bowser raises four issues on appeal. First, Bowser argues that the evidence presented at trial was insufficient to support his conviction for aggravated burglary.

4

Second, Bowser claims the district court erred in instructing the jury in several respects. Third, Bowser alleges that the State committed prosecutorial error during closing arguments. Fourth, Bowser argues that the cumulative effect of these alleged errors deprived him of a fair trial.

1. *Sufficiency of the evidence*

Bowser argues the evidence presented at trial was insufficient to support his aggravated burglary conviction. "'When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). "'In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. [Citations omitted.]'" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

The State charged Bowser with aggravated burglary under K.S.A. 2014 Supp. 21-5807(b), which states in relevant part: "Aggravated burglary is, without authority, entering into or remaining within any building . . . in which there is a human being with intent to commit a felony, theft or sexually motivated crime therein." The phrases "entering into" and "remaining within" refer to two separate factual situations. These phrases constitute alternative means of committing the crime of aggravated burglary. "The entering into element is satisfied when the evidence shows a defendant crossed the plane of a building's exterior wall. In contrast, the remaining within element refers to a defendant's presence in the building's interior after entry has occurred." *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

To find Bowser guilty of aggravated burglary, the district court instructed the jury that the State must prove the following elements: (1) that Bowser entered into or remained within Sims' and Brady's apartment; (2) that Bowser did so without authority; (3) that Bowser did so with the intent to commit aggravated robbery therein; (4) that at the time there was a human being inside; and (5) that this act occurred on or about January 18, 2015, in Wyandotte County, Kansas.

Brady testified that she did not give either suspect permission to be in her apartment. But Sims testified that when he looked through the peep hole, he recognized Ten/Bowser right away and opened the door, inviting him into the apartment. Although Sims admitted that Bowser initially had permission to enter the apartment, Sims testified that Bowser no longer had permission to be there after pulling the gun. Specifically, Sims testified: "[O]nce the gun was pulled, I don't want anybody inside so I was trying to hurry up and get 'em out of there." As a result, the State relied on the "remaining within" element during its opening statement and closing argument.

"The paradigmatic example of remaining within may occur when (a) a defendant's initial entry into a building was authorized; (b) authority is later withdrawn; and (c) defendant nevertheless stays inside the building." *State v. Gutierrez*, 285 Kan. 332, 337, 172 P.3d 18 (2007). Bowser argues the State failed to show that Sims or Brady ever affirmatively asked him to leave the apartment. For support, Bowser primarily relies on *Gutierrez*, 285 Kan. 332, and *State v. Mogenson*, 10 Kan. App. 2d 470, 701 P.2d 1339 (1985). In both of these cases, the defendants initially had consent to enter a residence but were later expressly told to leave. See *Gutierrez*, 285 Kan. at 339 (evidence sufficient to satisfy "remaining within" element of aggravated burglary where victim asked defendant to leave apartment); *Mogenson*, 10 Kan. App. 2d at 473 (trial court properly instructed the jury on "remaining within" element where victim demanded defendant leave house).

6

But Bowser cites no authority for his assertion that withdrawal of authority *must* be affirmative. Indeed, a conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). While neither Sims nor Brady testified that they ever demanded or requested that the two robbers leave the apartment, their failure to do so cannot be regarded as giving the robbers consent to remain inside. See *State v. Carr*, 300 Kan. 1, 168-69, 331 P.3d 544 (2014) (withdrawal of consent in aggravated burglary case may be proven by circumstantial evidence of firearms and threats uttered by defendants even in absence of explicit demands or requests to leave), *reversed on other grounds by Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). Sims testified that although he consented to Bowser's initial entry into the apartment, Bowser no longer had permission to be there after he pulled a gun. Sims also testified that Bowser demanded money and threatened to shoot him. When viewed in a light most favorable to the State, there was sufficient evidence for a rational jury to have found Bowser guilty of aggravated burglary.

2. *Jury instructions*

Bowser argues the district court committed three errors in its instructions to the jury. First, Bowser claims the court erroneously instructed the jury on the requisite culpable mental state for the crime of aggravated burglary. Second, Bowser alleges the court improperly instructed the jury on the mental state required for aiding and abetting. Third, Bowser contends the court erred by failing to provide the jury with an eyewitness identification instruction.

Bowser did not object to the instructions as given or request any additional instructions. When jury instructions are challenged for the first time on appeal, this court reviews the instructions for clear error. See K.S.A. 2017 Supp. 22-3414(3). This requires a two-step analysis. First, we must determine whether there was an error in the

7

instruction, which is a question of law subject to unlimited review. If an error exists, then we must determine whether reversal is required. To reverse, we must be firmly convinced that the jury would have reached a different verdict had the error not occurred. This requires a de novo determination based on a review of the entire record. *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012).

In reviewing for clear error, we first consider whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016). Legal appropriateness is whether the instruction fairly and appropriately states the applicable law. Like all questions of law, this court employs an unlimited standard of review. To determine whether the jury instruction was factually appropriate, this court determines if there was sufficient evidence, viewed in the light most favorable to the requesting party, to support a factual basis for the instruction. *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

a. *Culpable mental state for aggravated burglary*

Bowser argues the district court failed to properly instruct the jury on the mental state required to convict him for the crime of aggravated burglary. Bowser acknowledges that the instruction provided to the jury listing the elements of aggravated burglary correctly identified it as a crime that had to be committed with the specific intent to commit the crime of aggravated robbery. But Bowser claims the court erred by also providing a conflicting instruction which advised the jury that the State was required to prove that he "knowingly" committed the crime of aggravated burglary.

The crime of aggravated burglary is defined by statute as "without authority, entering into or remaining within any building . . . in which there is a human *being with intent to commit a felony*, theft or sexually motivated crime *therein*." (Emphases added.) K.S.A. 2014 Supp. 21-5807(b). Consistent with the statute, instruction No. 20 stated:

8

"The defendant Charles Bowser is charged in Count II with Aggravated Burglary. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant, Charles Bowser or another for whose conduct he was criminally responsible entered into or remained in a building, to-wit: residence located at . . . Kansas City, KS.

"2. The defendant Charles Bowser did so without authority.

"3. The defendant Charles Bowser did so with the intent to commit Aggravated Robbery therein.

"4. At the time there was a human being to-wit; Samuel Sims and Amy Brady in the residence.

"5. This act occurred on or about the 18th day of January, 2015, in Wyandotte County, Kansas.

"The elements of Aggravated Robbery are set forth in Instruction No. 18."

This instruction was followed by instruction No. 21, which stated:

"The State must prove that the defendant Charles Bowser committed the crime of Aggravated Burglary, knowingly.

"A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about."

Again, Bowser acknowledges that instruction No. 20 properly stated the elements of the crime of aggravated burglary, including the specific intent to commit the felony of aggravated robbery. But Bowser claims that instruction No. 21 was not legally appropriate because it conflicted with instruction No. 20 by erroneously informing the jury that the State only had to prove he knowingly committed the crime of aggravated burglary.

"[A]n instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm." *Plummer*, 295 Kan. at 161. To decide whether instruction No. 21 was legally appropriate, we must determine whether

9

the instruction correctly stated the required culpable mental state for the crime of aggravated burglary. Instruction No. 21 appears to be based on the pattern instruction pertaining to culpable mental state, PIK Crim. 4th 52.010 (2015 Supp.), which reads in relevant part:

> "The State must prove that the defendant (committed the crime) (*insert defendant's act that is the element of the crime which requires a particular culpable mental state*) *insert one of the following*:
> - intentionally.
>   or
> - knowingly.
>   or
> - recklessly."

As reflected by the use of parenthesis, the PIK instruction identifies two options to choose from in giving this instruction. The Notes on Use for this instruction, along with the corresponding statute, explain the circumstances under which each of the options should be used:

- The first parenthetical option is used (1) when the definition of a crime provides a culpable mental state for the commission of a crime, without distinguishing among the material elements, unless a contrary purpose plainly appears; and (2) when the definition of the crime does not provide a culpable mental state at all, unless the definition of the crime charged plainly dispenses with a culpable mental state. Notes on Use, PIK Crim. 4th 52.010 (2017 Supp.); K.S.A. 2017 Supp. 21-5202(d), (e), and (f).

- The second parenthetical option is used when the definition of the crime provides a culpable mental state only for a particular element or elements. In such a case, "the prescribed culpable mental state shall be required only as to [the] specified

10

element or elements, and a culpable mental state shall not be required as to any other element of the crime unless otherwise provided." K.S.A. 2014 Supp. 21-5202(g).

See Notes on Use, PIK Crim. 4th 52.010 (2017 Supp.).

As applied to the facts here, the definition of aggravated burglary specifies a culpable mental state for only one particular element: Bowser remained in an occupied building without permission *with the intent to commit a felony therein*. K.S.A. 2014 Supp. 21-5807(b). Because aggravated burglary requires a culpable mental state only for a particular element, the district court should have used the second parenthetical option in instruction No. 21.

The State suggests that using the first parenthetical option in instruction No. 21 was proper because "the State opted to prove all elements of aggravated burglary (other than the intent to commit the underlying felony) 'knowingly,' consistent with K.S.A. 21-5202(d)." But as noted above, aggravated burglary requires the culpable mental state "with intent" for the element to "to commit a felony, theft or sexually motivated crime therein." See K.S.A. 2014 Supp. 21-5807(b). According to K.S.A. 2017 Supp. 21-5202(g), this mental state applies only to this particular element and no mental state is required for any other element of the offense because the aggravated burglary statute does not provide otherwise.

Notably, aggravated burglary was previously defined as "*knowingly* and without authority entering into or remaining within any building . . . in which there is a human being, with intent to commit a felony, theft or sexual battery therein." (Emphasis added.) K.S.A. 21-3716. The Legislature omitted the word "knowingly" from the aggravated burglary statute in effect at the time of Bowser's crimes. See K.S.A. 2014 Supp. 21-5807(b). The Legislature's omission indicates that it is no longer required that a defendant

11

knowingly enter a building without authority in order to commit an aggravated burglary. See *State v. Zimbelman*, No. 111,759, 2015 WL 4577693, at *5 (Kan. App. 2015) (unpublished opinion) ("[T]he only apparent requirement of intent in K.S.A. 2012 Supp. 21-5807[b] is that the defendant act with intent to commit a felony, theft, or sexually motivated crime once the defendant is inside the building."). Thus, when the district court instructed the jury that the State was required to prove Bowser knowingly committed the crime of aggravated burglary, this was an incorrect statement of the law. Because instruction No. 21 was not legally appropriate, the district court erred in so instructing the jury.

To find this error reversible, however, we must be firmly convinced that the jury would have reached a different verdict had instruction No. 21 correctly stated the mental state applicable to aggravated burglary. Whether instructional error is clearly erroneous requires an unlimited review of the entire record. Bowser has the burden to establish the degree of prejudice necessary for reversal. See *Williams*, 295 Kan. at 516.

Bowser claims that the jury could have reached a different verdict if it had been given the appropriate legal standard. Bowser asserts that the erroneous instruction diluted the State's burden of proof and could have reasonably led the jury to convict based on a finding that Bowser merely acted knowingly rather than intentionally. In support of this assertion, Bowser notes that Sims testified he was acquainted with Ten and invited him inside the apartment. Given this relationship, Bowser suggests the jury reasonably could have concluded that Bowser was merely aware of the other suspect's plan to rob Sims and Brady, rather than concluding that Bowser intended to rob Sims and Brady or assist the other suspect in doing so.

Bowser's suggestion that the jury could have convicted him of aggravated burglary based on a finding that he merely knew about the other suspect's plan is completely at odds with the evidence presented at trial establishing that Bowser was an active

12

participant in the crime. The State presented evidence that immediately upon entering Sims' apartment, Bowser pointed a gun at Sims and demanded money. The State also presented evidence that Bowser made threats, rifled through drawers and cabinets in the kitchen, and took money and other items belonging to Sims and Brady. And, as Bowser readily acknowledges, instruction No. 20 set forth the appropriate legal standard for the charge of aggravated burglary. For all of these reasons, we are not firmly convinced that the jury would have reached a different verdict had the court used the second parenthetical option in instruction No. 21.

b. *Culpable mental state for aiding and abetting*

Bowser argues the district court erred in instructing the jury on the theory of aiding and abetting by informing the jury that it could convict him of aiding and abetting by finding that he did so knowingly rather than intentionally.

Instruction No. 18 defined the elements of aggravated robbery and required the State to prove in relevant part that "the defendant, Charles Bowser or another for whose conduct he was criminally responsible, knowingly took property . . . from the presence of Samuel Sims and Amy Brady." Instruction No. 19 provided:

"The State must prove that the defendant Charles Bowser committed the crime of Aggravated Robbery, knowingly.
"A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about."

But the district court also instructed the jury that it could find Bowser guilty of the aggravated robbery under the theory of aiding and abetting. Specifically, the court issued instruction No. 32 (based on PIK Crim. 4th 52.140) on aiding and abetting culpability:

13

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime."

The language of the instruction conforms with K.S.A. 2017 Supp. 21-5210(a) ("A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime.").

Bowser does not challenge the wording of any of these instructions. Instead, Bowser argues that when read as a whole, the required mental state of knowingly in the aggravated robbery instruction effectively lowered the required mental state (from intentionally to knowingly) in the aiding and abetting aggravated robbery instruction.

When we review claimed instructional error, "we examine the instructions as a whole, rather than isolate any one instruction." *State v. Ellmaker*, 289 Kan. 1132, 1139-40, 221 P.3d 1105 (2009). In addition, we presume the jury followed the instructions. *State v. Mitchell*, 294 Kan. 469, 482, 275 P.3d 905 (2012). Applying these rules, we are not persuaded by Bowser's claim that the district court lowered the requisite mental state for aiding and abetting from intentionally to knowingly simply by instructing the jury on the requisite mental state for the crime of aggravated robbery. Instruction No. 32 clearly conveyed to the jury that Bowser, to be found guilty for a crime committed by another, must have *intentionally aided* in the commission of the crime. See *State v. Potts*, 304 Kan. 687, 703-04, 374 P.3d 639 (2016) (unnecessary to add definition of intentional conduct to instruction on aiding and abetting liability). The instruction also clearly conveyed to the jury that Bowser, to be found guilty for a crime committed by another, must have the required mental culpability for the crime at issue, which in this case is committing the crime of aggravated robbery knowingly. Bowser makes no claim that

14

instructions 18 and 19, defining the elements of aggravated robbery and the mental state required for aggravated robbery, were incorrect statements of the law.

Instructions 18, 19, and 32 accurately state Kansas law and did not mislead or confuse the jury about the level of intent a defendant must have to be found guilty under an aiding and abetting theory. Bowser's claim of error necessarily fails.

c. *Eyewitness identification instruction*

Bowser argues the district court erred when it failed to give the jury an instruction regarding the various factors jurors should consider in weighing eyewitness reliability. In particular, Bowser asserts an eyewitness identification instruction should have been given because there were serious questions about the reliability of the eyewitness identification by Sims and Brady. Bowser claims these identifications were a critical part of the State's case and the jury should have been instructed on factors to consider when evaluating their testimony.

The eyewitness identification instruction Bowser argues should have been given is found in PIK Crim. 4th 51.110 (2017 Supp.). This PIK instruction is based on *State v. Hunt*, 275 Kan. 811, 69 P.3d 571 (2003), and instructs the jury factors to consider in weighing the reliability of eyewitness testimony:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

15

"5.  Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6.  Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 4th 51.110 (2017 Supp.).

The Notes on Use accompanying PIK Crim. 4th 51.110 (2017 Supp.) state:

"This instruction should be given whenever the trial judge believes there is any serious question about the reliability of eyewitness identification testimony. *State v. Willis*, 240 Kan. 580, 585, 731 P.2d 287 (1987). However, unless there is evidence which causes the trial court to question the reliability of the eyewitness identification, this instruction should not be given. *State v. Harris*, 266 Kan. 270, 278, 970 P.2d 519 (1998)."

We first must decide whether the giving of an eyewitness identification instruction at Bowser's trial would have been legally and factually appropriate, employing an unlimited review of the entire record. See *Louis*, 305 Kan. at 457-58. There is no question that PIK Crim. 4th 51.110 (2017 Supp.) is a correct statement of the law. See *Plummer*, 295 Kan. at 163. But the parties disagree on whether such an instruction was warranted under the facts here. Bowser argues that the district court should have instructed the jury on eyewitness identification because Sims' and Brady's eyewitness identification was a critical part of the State's case and there was serious question about the reliability of their identification. The State concedes that eyewitness identification was a critical part of this case but claims there was no serious question about the reliability of the eyewitness identification.

Our Supreme Court has held that an eyewitness identification instruction is not necessary when the witness is familiar with the person being identified. See, e.g., *State v. Trotter*, 280 Kan. 800, 808-09, 127 P.3d 972 (2006) (no instruction necessary where defendant had been to witness' house and was not a stranger to witness); *State v. Mann*,

16

274 Kan. 670, Syl. ¶ 2, 56 P.3d 212 (2002) ("Where the witness personally knows the individual being identified, the cautionary eyewitness identification instruction is not necessary and the accuracy of the identification can be sufficiently challenged through cross-examination."); *State v. Saenz*, 271 Kan. 339, 354, 22 P.3d 151 (2001) (eyewitness identification instruction "contemplate[s] an eyewitness who does not know the defendant personally"). In this case, the evidence shows that Sims personally knew Bowser prior to the robbery. Sims testified that he knew Ten from around the apartment complex and that they had smoked marijuana together on more than one occasion before the robbery. Sims further testified that he immediately recognized Ten when he looked through the peep hole of the door. Although Sims did not know Ten's legal name, he immediately identified Ten as one of the robbery suspects to the responding officers that night. Sims later identified Bowser as Ten in a six-person photographic lineup and at trial. Because the evidence shows that Sims personally knew Bowser, the individual being identified, the cautionary eyewitness identification instruction was not necessary in this case. Accordingly, the district court did not err in failing to give an eyewitness identification instruction with respect to Sims' identification of Bowser.

Nevertheless, Bowser argues the instruction was necessary for the jury to evaluate Brady's identification because she gave inconsistent testimony regarding whether she had ever seen the suspects prior to the night of the robbery. As earlier stated, a district court should give a PIK Crim. 4th 51.110 (2017 Supp.) instruction "'in any criminal action in which eyewitness identification is a critical part of the prosecution's case and there is serious question about the *reliability* of the identification.' [Citations omitted.]" *State v. Duong*, 292 Kan. 824, 836, 257 P.3d 309 (2011). "Evidence calling reliability into question is key." 292 Kan. at 836. Brady's identification of Bowser was at least corroborating of Sims' identification, if not critical. For this reason, we will take up Bowser's claim that there was a serious question about the reliability of Brady's identification as it pertained to Bowser.

17

Our Supreme Court has identified five factors to determine whether there is a serious question about the reliability of an eyewitness identification:

"'(1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior descriptions of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.'" *Duong*, 292 Kan. at 836 (quoting *Saenz*, 271 Kan. at 354).

Applying these factors to Brady's eyewitness identification, we find the evidence fails to establish any serious question about the reliability of Brady's identification of Bowser as one of the men who robbed her and Sims. Although Brady gave conflicting statements about whether she recognized or knew the two suspects prior to the robbery, she testified that she had the opportunity to look at the face of the man she later identified as Bowser when she handed him her purse and Sims' wallet. Brady saw Bowser again when he came into her bedroom and took the shotgun from her. On the night of the robbery, Brady described Bowser as a tall black male in his late teens or early 20s, dressed in all black, and wearing a hoodie and beanie. A few weeks after the robbery, Brady identified Bowser in a photographic lineup. Brady also identified Bowser at trial and described the man who robbed her as a black male in his teens or early 20s with a dark complexion and bright, white, beady eyes. Brady agreed that on the night of the robbery, she was scared and confused and had smoked marijuana. But Brady denied that her ability to see or recall some details about Bowser's face was affected. Detective Fincher testified that Brady was upset when he spoke with her but that she understood his questions, she responded appropriately, and she did not appear to be intoxicated. There was no testimony regarding Brady's level of certainty about the identification and no other suggestion in the record that Brady expressed any uncertainty. We find no serious question about the reliability of Brady's identification. As a result, the district court did not err in failing to give an eyewitness identification instruction with respect to Brady's identification of Bowser.

3. *Prosecutorial error*

Bowser argues that the prosecutor committed error during closing argument by using a misleading analogy that improperly sought to define the "beyond a reasonable doubt" standard and diluted the State's burden of proof. Although Bowser did not object to the prosecutor's statements at trial, a contemporaneous objection is not necessary to preserve a claim of prosecutorial error based upon comments made during closing argument. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012).

Our review of a claim of prosecutorial error in closing arguments requires a two-step process:

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." *State v. Sherman*, 305 Kan. 88, Syl. ¶ 7, 378 P.3d 1060 (2016).

Prosecutors are given wide latitude in language and manner or presentation of closing arguments, so long as the argument is consistent with the evidence. *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000). But "[a] prosecutor may not misstate the law applicable to the evidence presented, may not offer a personal opinion about witness credibility, and may not shift the burden of proof to the defendant." *State v. Pribble*, 304 Kan. 824, Syl. ¶ 6, 375 P.3d 966 (2016). It is also improper for the prosecutor to misstate the legal standard of the burden of proof. *State v. Stone*, 291 Kan. 13, 18, 237 P.3d 1229 (2010).

Bowser complains about the following statements made during the rebuttal portion of the State's closing argument:

"One of the things about being a juror we talked about is you have to check your personal bias at the door. You don't have to like the victims, you don't have to like [their] lifestyle in order to find beyond a reasonable doubt that these two defendants committed the crimes as charged. That's not an element. And I would ask you to check any personal bias when you walk into that jury room and make your decision based on the elements of the law provided to you by the court and the evidence presented here in court.

"Talked about the situation being chaotic. You know, consider big events. Most people have been to a wedding in their life and everybody at weddings, there's a lot of things going on, a lot of people there, a lot of different details. Some people are wanting to see the bride's dress and focusing on that, some people are looking at the flower arrangements and admiring them. Some people, like my husband, would be looking at the program trying to figure out how long it's going to take before he can get out of there. Some other people may be focused on overpowering perfume of the person sitting next to them. In focusing on those different things like the dress, the perfume, the program, the flowers, they may miss other details. Person looking at the program may not notice the rhinestones on the bride's shoes. That doesn't mean those rhinestones weren't present, it just means that person didn't notice them. Missing some of those details doesn't mean that the wedding didn't happen, it doesn't mean that the bride and groom weren't there, it just means that different people notice different things."

Bowser compares these comments to a "puzzle analogy" that implicates the burden of proof. Our Supreme Court has held that such analogies are "improper and to be avoided." See *Sherman*, 305 Kan. at 96, 117 (prosecutor analogized concept of reasonable doubt to picture of Mount Rushmore with Theodore Roosevelt's face removed); see also *State v. Stevenson*, 297 Kan. 49, 52-55, 298 P.3d 303 (2013) (prosecutor noted that although one letter was missing from "Wheel of Fortune" sign, there was no doubt about what letter was needed to complete title). Bowser claims that the prosecutor's comments about missing pieces of information at a wedding told the jury that it could use a diluted burden of proof in deciding the case and implied that even if the

20

State's case was lacking, the jury should find Bowser guilty of the crimes despite any reasonable doubt.

Bowser's comparison to the disapproved of comments made in *Sherman* and *Stevenson* is inappropriate. The prosecutor's statements here in no way attempted to define the concept of reasonable doubt, diminish the State's burden of proof, or otherwise suggest to the jury that it might convict on anything less than proof beyond a reasonable doubt. The prosecutor did not ask the jury to fill in any elements that needed to be proved beyond a reasonable doubt or otherwise misstate the appropriate standards. In fact, the prosecutor referred to and properly stated the burden of proof twice in her initial closing argument.

A prosecutor's wide latitude in closing arguments includes "the freedom to craft an argument that includes reasonable inferences based on the evidence." *Pabst*, 268 Kan. at 507. Counsel for both defendants cross-examined Sims and Brady extensively about inconsistencies in their prior statements and testimony. Detective Fincher testified that it was not uncommon for witnesses to a crime to make inconsistent statements. During closing argument, counsel for both defendants challenged the credibility of Sims and Brady based on their inconsistent statements and testimony. When read in context, the prosecutor's comments were made in an attempt to provide a reasonable inference explaining why Sims and Brady may not have had the same recollection of the robbery or seen exactly the same things. As a result, the prosecutor's statements did not fall outside the wide latitude afforded to prosecutors in closing arguments and thus did not constitute error.

4. *Cumulative error*

Finally, Bowser argues that the cumulative effect of the errors alleged above deprived him of his constitutional right to a fair trial. When a party argues that the

cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. *State v. King*, 297 Kan. 955, 986, 305 P.3d 641 (2013). In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. *State v. Sean*, 306 Kan. 963, 993, 399 P.3d 168 (2017).

Based on the analysis above, we found the district court erred by instructing the jury on the requisite culpable mental state for the crime of aggravated burglary. A single error, however, cannot constitute cumulative error. See *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014). Accordingly, Bowser's claim of cumulative error necessarily fails.

Affirmed.